Filed 2/16/22  In re K.S. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | C094171 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.H.,<br><br>Defendant;<br><br>K.S.,<br><br>Appellant. | (Super. Ct. No. JD240611) |

Minor K.S. appeals from the juvenile court's order bypassing reunification services under Welfare and Institutions Code[1] section 361.5, subdivision (b)(6).  She argues the juvenile court improperly denied reunification services to mother based on

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

findings of severe sexual abuse of minor and her two younger siblings.[2] In particular, K.S. contends the court did not adequately consider whether she would benefit from reunification services. We will affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2020, K.S., who was 13 years old at the time, arrived at the children's receiving home with two other youths who were known child sexual exploitation recruiters. A social worker from the Department of Child, Family and Adult Services (Department) contacted mother, who told the social worker K.S. had a history of running away, and she had recently sent K.S. to live with K.S.'s paternal relatives in Texas. The relatives had then sent K.S. back to mother shortly after father, who had been in prison in Texas, was released. Officers returned K.S. to mother. The next day, K.S. ran away again.

The Department discovered that in April 2020, Texas child protective services had opened a case involving physical abuse of K.S. by her paternal aunt and K.S. had been diagnosed with depression and prescribed medication in April. K.S. had been posting sexual pictures on social media Web sites and had been raped in Texas. K.S.'s paternal aunt explained K.S. and her younger sister "presented with sexualized behaviors," and said both children told stories about domestic violence and drug use at mother's home.[3] She said K.S. had been "exploited at a trap house" and had observed blood on K.S.'s underwear. K.S. later acknowledged to social workers she had been an exploitation victim in Texas.

Later in May 2020, a sheriff's deputy spoke to K.S. in response to a call. K.S. told the deputy that mother and mother's boyfriend, T.W., had driven her home from the

---

[2] K.S.'s younger siblings have separate cases and are not parties to this appeal.

[3] K.S. has a younger sister, then 12 years old, and a younger brother, then six years old.

airport when she returned from Texas. T.W. had rubbed K.S.'s vagina in the car while mother was inside the home. K.S. told her mother about the incident, who confronted T.W., and T.W. replied that "he was checking to see if the youth would go along with it." The deputy also saw K.S. had posted sexually explicit videos of herself on a social media Web site.

A social worker asked mother about T.W. Mother became upset, said T.W. did not live in her home, and said K.S. was "not a victim" because her behavior was "a personal choice." She complained K.S. "makes her life hell" in the presence of K.S., and said when she found K.S. after she had run away, she had been told K.S. was having sex with three males. Mother was unaware of K.S.'s medical diagnosis and medication.

K.S. told social workers she was uncomfortable in mother's care while mother was with T.W. because T.W. used cocaine and sold drugs. She reported multiple incidents of domestic violence dating back to 2019, before she was sent to Texas, and said mother allowed T.W. to physically abuse K.S.[4] In particular, she said mother had punched her and allowed T.W. to hit her and drag her by the hair. K.S.'s younger sister stated she had seen drugs around the house, but had never seen mother or T.W. use drugs or abuse K.S. Mother became upset when asked about T.W. and denied any abuse, saying K.S. was a liar who wanted attention. K.S. interjected, saying T.W. had pulled her hair and bruised her arm only a couple days ago, although the social worker did not observe any bruises on K.S.'s arm.

A few days later, K.S. again ran away from home. K.S. stayed with her younger brother's stepmother and had sex with two juveniles in the stepmother's garage.

In June 2020, the Department filed a juvenile dependency petition under section 300, subdivisions (b)(1), (2), and (c). The petition alleged mother was unwilling or

---

[4] Mother later stated T.W. had been around the children for approximately two years.

3

unable to supervise K.S., a habitual runaway, who had been sexually exploited. In particular, K.S. posted sexually explicit posts on social media, used drugs, and mother had not protected K.S. from T.W. Moreover, mother had not protected K.S. from sexual exploitation based on the April 2020 incident in Texas. Finally, mother was not capable of providing appropriate care for K.S.'s mental health issues. The Department sought, and received, a protective custody warrant for K.S.

The Department and mother were unable to find K.S. to execute the warrant. K.S.'s younger brother told a social worker he had seen T.W. hit mother, and that T.W. would hit him and make him cry when he was in trouble. He said he did not know what happened when the sister got in trouble, but did know mother would hit K.S. when she got in trouble. When the social worker asked mother about T.W., mother became agitated. She discounted the brother's account of domestic violence, saying that it happened two years ago. When the social worker noted the sister had stated the incident occurred within the past month, mother summoned the sister and challenged her. Mother agreed to a safety plan that involved no contact between T.W. and the minors.

At the detention hearing, the court ordered K.S. detained, although her location was unknown.

### Jurisdiction/Disposition Report and Addenda

The jurisdiction/disposition report provided further details on the allegations in the petition. Mother said she did not know how to supervise K.S. when K.S. would run away and lie to get out of trouble. She did not have proof K.S. was being sexually exploited, but admitted the possibility. Mother explained K.S. had been expelled from middle school in January 2019 and was sent to live with K.S.'s maternal grandfather. K.S. then got suspended from school and claimed the grandfather would "whip her," so mother picked her up. Mother then sent K.S. to Texas to live with her paternal relatives, but K.S. asked to come home and returned in December 2019. In January 2020, K.S. ran away to " 'be with a boy,' " but mother found her.

4

Mother stated she was still in a relationship with T.W., but she did not have T.W. around K.S. because of the abuse allegations. She denied witnessing T.W. abuse K.S. She stated she was willing to ensure K.S. received mental health care.

Between June 30, 2020, and March 1, 2021, the Department did not know where K.S. was, and the court continued the jurisdiction/disposition hearing multiple times. During this period, the Department filed multiple addenda updating the court on the case. In August 2020, mother told a social worker she was in daily contact with K.S., although K.S. used different phone numbers to speak with her every time, and reported that K.S. was in Oakland. In September 2020, mother again said she spoke with K.S. daily and saw a video on Instagram of K.S. drinking in a bar and dancing on a stripper pole. K.S. was later arrested in Phoenix for shoplifting, but ran away from a group home after law enforcement dropped her off. In October 2020, a social worker attempted to meet with mother, but when he arrived at her home, people in the home pretended no one was home, even though the social worker had heard people talking and saw someone looking through the front window curtains.

In November 2020, mother reported she had been following K.S. on social media and believed K.S. was using stolen phones to call or text mother. K.S. stated she was in Arizona. In December 2020, mother said K.S. contacted her to ask for money, but K.S. would stop communicating with her whenever mother asked K.S. to come home. Mother said K.S. lies and is manipulative.

In January 2021, the Department reported on special assault forensic evaluation (SAFE) interviews that had been conducted with K.S.'s younger siblings.[5] The younger sister stated T.W. had made inappropriate comments to her back in 2019, and had rubbed her thigh while she was riding in a car and touched her buttocks in a grocery store

---

[5] Transcripts of the interviews were also filed for the court's review.

sometime between December 2019 and February 2020.  In February 2020, K.S. told the sister that T.W. had kissed K.S. on the mouth, but the sister noted K.S. " 'lies a lot.' " The sister stated K.S. had initially run away in March 2020 after she had told mother about T.W.'s conduct.  She explained K.S. had been "prostitutin and things like that" when K.S. ran away.

The younger sister lived with her godmother in March 2020, but returned to live with mother in April 2020.  When she returned to mother's home, T.W. asked her, " 'If we did something and no one else knew about it, would you tell anyone?' "  and then made her promise not to tell mother.  In June 2020, T.W. pulled up her shirt and bra put his mouth on her breast area.  Mother was in the bedroom at the time, and T.W. stopped when she came out.  In another instance, in August 2020, T.W. told the sister to pull down her pants and commented on her genitals.  Mother was in the shower, and T.W. stopped when he heard mother get out of the shower.  A week later, T.W. came into the sister's bedroom naked, put his mouth on her genitals, and put her hand on his genitals. In a different instance, she had a friend over and T.W. had come into her bedroom wearing only boxers and groped himself.

When law enforcement came to interview the younger sister in September 2020, mother told her not to say anything.  The younger sister ultimately decided to leave with her younger brother and stay at a cousin's house, and texted mother about what T.W. had been doing.  Mother dismissed the incidents.  The younger sister explained mother never believed K.S., so she did not think mother would believe her, stating mother " 'always chooses [T.W.] over her kids.' "  She stated mother has repeatedly said she would break up with T.W., but they would get back together in a couple of days.  The younger sister stated she has had difficulty sleeping, has started crying spontaneously, and started cutting herself in July 2020.  She believed everything was her fault because she did not tell anyone she was uncomfortable.  The sheriff's department reported there had been

6

multiple domestic disturbance calls involving mother and T.W. between July and October 2020.

The younger brother stated he had seen T.W. and mother fight in the home. He said mother and T.W. would watch " 'movies about sex' " with him. He described the pornographic movies, and stated mother was " 'on top of' " T.W. while the movie was playing. His four-year-old cousin was also present. This happened more than once. He also stated mother and T.W. had made him watch them have sex, and T.W. told the brother to take off his clothes and sit on the bed. He described the sexual activities between mother and T.W. in detail, and explained mother's leg came into contact with his "private part" while she and T.W. had sex.

The Vallejo Police Department found K.S. and delivered her to child protective services, but K.S. ran away from the facility where child protective services placed her. In January 2021, mother said she was not able to contact K.S., although she believed K.S. was going to Los Angeles based on a social media post. Mother had been receiving individual counseling and was scheduled to begin parenting education classes.

In February 2021, mother had completed individual counseling and expressed "the importance of self-awareness and knowing what the children are experiencing." She also understood that she should delay dating to work on herself and have more time for the children. In March 2021, the Department located K.S. in Las Vegas and placed her in a short-term residential treatment program in Fresno. The Department recommended section 361.5, subdivision (b)(6) apply to mother based on the sexual abuse experienced by K.S. and her two younger siblings, but that reunification services still be offered under section 361.5, subdivision (c) because services would be in the best interest of K.S. In particular, the Department noted K.S. had lived with mother for the majority of her life, had an established relationship with mother, and had maintained contact with mother, even though she had run away. Mother had also completed individual counseling successfully, and stated she had ended her relationship with T.W. In April 2021, the

7

Department filed an amended petition, adding allegations related to the sexual abuse of K.S. and her siblings.

*Contested Jurisdiction/Disposition Hearings*

Mother testified at the jurisdiction hearing on April 14, 2021. She explained she had completed her individual and group counseling sessions. Mother testified she had learned to be "more aware" of signs of sexual exploitation, and that she now knew "what to look for and how to recognize these things." She said she had previously been "isolating my kids" and had "developed a relationship with the children" where she was not "aware of a lot of things." As a result, she had simply believed the things they said and allowed them to manipulate situations. She explained she had now learned how to be "firm" and "disciplined" in her interactions with her children. She noted her drug tests had all been negative, except for THC. She had maintained consistent contact with K.S. and agreed they were "pretty close."

Mother said she realized she spent less time with her children when she was in a romantic relationship. She stated she had broken up with T.W. in October and had not had any contact with him since then. She was living in the same apartment she had been living in since March 2020. She worried that K.S. would run away if the court did not provide a possibility she and K.S. could reunify at some point. She explained she was the "best person for [K.S.] to have in her life" and had "done everything in my power" for her children's "entire lives to take care of them to the best of my ability."

The court sustained the allegations in the amended petition and set a disposition hearing.

Later in the month, the Department filed another addendum report, which explained K.S. was 22 weeks pregnant and was displaying "alarming, erratic and volatile" behaviors at the short-term residential treatment program, including drinking, smoking, and yelling at staff. The report noted an incident in which K.S. said mother was still seeing T.W. K.S. told a social worker that while she had been a runaway, she

8

arranged a visit with mother at a hotel. When she arrived at the hotel, she saw T.W.'s car, a red Dodge Charger with black racing stripes, in the parking lot. K.S. left without visiting mother.

The report also recounted a recent incident in which social workers had gone to mother's apartment and discovered mother had not lived in the apartment since January 2021. Mother still received mail at the apartment complex, and the apartment manager had seen her drive into the complex in a red Dodge Charger with black racing stripes. A social worker called mother, who confirmed she still lived in the apartment. When the social worker pressed mother about her address, mother began to talk "loud and fast," and said she had moved out of the apartment " 'two weeks ago, about.' " When the social worker stated she understood mother had moved out in January, mother became flustered and accused the social worker of calling her a liar.

At the next court hearing, on April 29, 2021, mother's counsel asked to reopen evidence so mother could testify about the latest report, and the court granted the request. The juvenile court thus held a jurisdiction/disposition hearing the next day. K.S.'s counsel submitted a stipulation detailing what K.S.'s testimony would be if she were called to testify. In the stipulation, K.S. stated she had been "misquoted" in the most recent addendum report. In particular, T.W. drove a white Ford Mustang, and K.S. did not believe mother was with T.W. anymore. She had not seen T.W. when she was visiting her mother and had not seen T.W. in the contacts in mother's phone.

A social worker testified for the Department. She stated the Department had concerns about mother's truthfulness. She testified that when she was escorting K.S. in the airport, mother was waiting in the parking lot with a red Dodge with black racing stripes. When K.S. saw the car, she was angry and said, "I better not see any of his cars down there," in reference to T.W. She repeated the information in the report, saying K.S. had seen the red Dodge Charger, which she understood to be T.W.'s car, in a motel parking lot when visiting mother. K.S. told the social worker that if T.W. was allowing

9

mother to use the car, then mother was likely "still mixed up with [T.W.] . . . . That dude don't give anybody anything for free." Mother told the social worker she did not own a car and was borrowing the Dodge Charger from a friend. If mother was still seeing T.W., the social worker said, it would show "mother has failed to benefit from her services thus far." But it would still be in K.S.'s best interests for mother to receive reunification services because of K.S.'s connection with mother.

Mother testified again. She stated she owned a red Dodge Charger that she had owned since July 2020, and it was not connected to T.W. K.S. would not have seen the car until she saw it at the airport parking lot. She denied ever speaking with a social worker about the car. She stated she had moved out of her apartment in March and was staying at a hotel. On cross-examination, the Department's counsel noted she had previously testified she was living in an apartment, rather than a hotel, and mother responded, "I don't remember testifying or anybody ever even asking me about housing, so I don't know where you got that information."

The court determined section 361.5, subdivision (b)(6) applied to the case. The court first reviewed the evidence of the sexual abuse and overall home environment. Specifically, the court observed mother and T.W. were physically abusive towards K.S. and her younger sister. T.W. began molesting K.S. and the younger sister around January 2020, and a police report was taken regarding K.S.'s abuse in May 2020. T.W. admitted to the abuse and mother agreed to a safety plan that would keep T.W. away from the minors. But mother did not comply with the safety plan, and T.W. molested the younger sister shortly thereafter. The younger sister spoke with law enforcement and mother told her not to tell them anything. Mother was also complicit in the sexual abuse of the younger brother. The court reviewed the statutory factors in section 361.5, subdivision (i) as to whether reunification services would benefit the minors and concluded they would not. The court also considered whether reunification services would still be in the best interests of K.S., but explained it was troubled by mother's

10

testimony because she showed little insight into why the children had been removed; perjured herself with respect to her living situation; appeared to be dishonest about the car she was driving, and thus her relationship with T.W.; and participated in the molestation of the minors. Thus, despite mother's close relationship with K.S., the court denied mother reunification services.

## DISCUSSION

K.S. contends the juvenile court erred when it denied mother reunification services because "[t]he court failed to adequately address the second prong of [section] 361.5[, subdivision ](b)(6)[,] which requires that the trial court must also find clear and convincing evidence that the child would not benefit from the provision of reunification services." Thus, the court's findings were "not supported by substantial evidence." We disagree.

When a child is removed from the parent's home, reunification services may be offered to the parent " 'in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.]' [Citations.] Section 361.5, subdivision (b) sets forth certain exceptions—also called reunification bypass provisions—to this 'general mandate of providing reunification services.' [Citations.]" (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.)

Section 361.5, subdivision (b)(6)(A) provides for the denial of reunification services where a "child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." "By its express terms, section 361.5, subdivision (b)(6) applies to a parent who gave actual or implied consent to the sexual abuse of the child by another person, as well as to the parent who was the actual perpetrator of the sexual abuse." (*Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, 561.)

11

To determine whether "reunification services will benefit the child," section 361.5, subdivision (i) directs the court to consider "any information it deems relevant, including . . . [¶] (1) The specific act or omission comprising the severe sexual abuse or the severe physical harm inflicted on the child or the child's sibling or half sibling. [¶] (2) The circumstances under which the abuse or harm was inflicted on the child or the child's sibling or half sibling. [¶] (3) The severity of the emotional trauma suffered by the child or the child's sibling or half sibling. [¶] (4) Any history of abuse of other children by the offending parent or guardian. [¶] (5) The likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision. [¶] (6) Whether or not the child desires to be reunified with the offending parent or guardian."

"We review an order denying reunification services by determining if substantial evidence supports it." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 196.) " 'In making this determination, we must decide if the evidence is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the court's order was proper based on clear and convincing evidence. [Citation.]' " (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 839-840.) "[W]e do not make credibility determinations or reweigh the evidence." (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121.) And "we resolve all conflicts in the evidence in favor of the juvenile court's finding." (*In re Gabriel K*, at p. 196.)

Here, K.S. was adjudicated a dependent under section 300 as a result, in part, of allegations of severe sexual abuse against K.S. and her younger siblings. The court considered whether reunification services for mother would benefit K.S. using the factors listed in section 361.5, subdivision (i). As to the first two factors, the specific act(s) of abuse and the circumstances of that abuse, the court noted mother had, at best, implicitly consented to the sexual abuse of the minors. For the third factor, the court observed the abuse had inflicted severe emotional trauma on K.S. and her younger sister. For the

12

fourth factor, there was some evidence that at least one other child, aside from the minors, was involved in the abuse. And for the fifth and sixth factors, the likelihood K.S. could be returned to mother's care was "slim," but K.S. had made it clear that she wanted to return to her mother.

Substantial evidence shows mother knew and impliedly consented to the sexual abuse of the minors. As the court observed, T.W. first molested K.S. and her younger sister around January 2020; according to the younger sister, he rubbed her thigh in the car and touched her buttocks in the grocery store somewhere between December 2019 and February 2020. K.S. said T.W. had kissed her on the mouth in February 2020, and had rubbed her vagina in the car when she returned from Texas, sometime around May 2020. K.S. told her mother, who confronted T.W., and T.W. admitted "he was checking to see if the youth would go along with it." In June 2020, mother agreed to a safety plan that involved keeping T.W. away from the minors, but repeatedly violated the plan. K.S.'s younger sister described multiple instances when she was left alone with T.W. and he abused her. She told mother about the abuse, but mother dismissed her accounts and even told her not to tell law enforcement anything when they came to interview her. Mother was also complicit in sexually abusing the younger brother on more than one occasion.

Evidence also supported the conclusion the minors suffered severe emotional trauma as a result of the abuse. The younger sister explained she would spontaneously cry and began cutting herself in July 2020. She also observed K.S. had initially run away because of the abuse. And, consistent with the fourth factor, the abuse involved at least one other child because the younger brother's four-year-old cousin was present in one of the incidents.

As to the likelihood that K.S. would be returned to mother's care within 12 months, the record supports the inconsistencies the court identified in mother's testimony with respect to her living situation, as well as the various statements about the Dodge

13

Charger and her relationship with T.W. Despite her statements that she was no longer seeing T.W., the younger sister stated mother had said she would leave T.W. "on multiple occasions," but would then get back together with him. As noted above, we do not review the juvenile court's findings on mother's credibility. (*Jennifer S. v. Superior Court, supra*, 15 Cal.App.5th 1113 at p. 1121.) We agree, however, that mother's lack of credibility decreased the likelihood K.S. could be safely returned to the mother's care because it suggested she was still in a relationship with T.W., despite her statements to the contrary. And, as the court noted, mother's testimony about what she had learned from the services she had received thus far showed little insight into the reasons why the minors had been removed in the first place and focused more on general parenting insights, supporting the court's conclusion it could be some time before it was safe to return K.S. to mother's care.

The court also considered the facts in favor of reunification services. The court acknowledged K.S. did want to return to mother's care. The court noted K.S. corresponded with mother, was pregnant, and expressed concern K.S. "may go AWOL again" if she was not placed with mother. Contrary to K.S.'s contention, the court did not ignore the factors supporting reunification services in favor of expressing its "disgust at the facts of this case"; it simply determined that the factors in section 361.5, subdivision (i) supporting the denial of reunification services outweighed the factors in favor of reunification services.

K.S. argues the court's ruling could not be supported by substantial evidence because the parties at the hearing concurred that reunification services were warranted. But the question is not whether there was more than one conclusion the court could reasonably reach; it is whether there was sufficient evidence to support the conclusion the court actually made. (*In re M.F.* (2019) 32 Cal.App.5th 1, 14-15.) Given the evidence of mother's complicity in the abuse of the minors and mother's lack of credibility, sufficient evidence supported the court's conclusion. (See *Amber K. v. Superior Court, supra*,

14

146 Cal.App.4th at p. 563 [approving denial of reunification services where "[m]other allowed father, a known sexual molester, to stay overnight at her home with the children"].)

**DISPOSITION**

The juvenile court's orders are affirmed.

      /s/_____
      HOCH, J.

We concur:

/s/_____
BLEASE, Acting P. J.

/s/_____
DUARTE, J.